ESTATE OF William F. SHEBEL, Jr., by Delores SHEBEL, Personal Representative, Appellant–Plaintiff,

v.

YASKAWA ELECTRIC AMERICA, INC., and Mori Seiki Co., Ltd., Appellees–Defendants.

No. 46A03–9509–CV–318.

Court of Appeals of Indiana.

March 12, 1997.

Transfer Granted July 17, 1997.

Gene M. Jones, Mark A. Lienhoop, Newby, Lewis, Kaminski & Jones, LaPorte, for Appellant–Plaintiff.

Douglas K. Kieterly, David R. Kibbe, Barnes & Thornburg, South Bend, for Yaskawa Electric America, Inc.

Tracy C. Beggs, Burditt & Radzius, Chtd., Chicago, IL, Larry G. Evans, Hoeppner, Wagner & Evans, Valparaiso, for Mori Seiki Co., Ltd.

## OPINION

STATON, Judge.

A lathe crashed.[1] Metal fragments from the lathe killed William F. Shebel. His Estate filed a products liability action against Mori Seiki Co., Ltd., the manufacturer of the lathe, and Yaskawa Electric America. They moved for summary judgment. The trial court reviewed the issues and contentions raised by the motion for summary judgment, and then, concluded "... that one issue is dispositive of this matter, that being that Plaintiff's cause of action is barred by the applicable statute of repose." The trial court held that as a matter of law the action was barred. Shebel's Estate appeals the judgment of the trial court and raises these questions:

I. Whether a distributor of a product may become an initial user or consumer of that product by using it as a demonstrator model.

II. Whether a wholly owned subsidiary may be held strictly liable for a defective product manufactured by its parent company.

We conclude under these undisputed facts that the judgment of the trial court as a matter of law should be reversed.

1. "Crash" appears to be a trade term referring to a situation where the lathe's turret (the portion which contains the tool) strikes the lathe's chuck (the portion of the lathe which holds the part being manufactured).

The Statute, Indiana Code Section 33–1–1.5–5(b) (1993) provides that "a product liability action must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer."

Before the lathe crashed at Kaufman's shop, it traveled through five hands. In the beginning, Mori Seiki manufactured the lathe, and later, sold it to Yamazen Company, Ltd., a trading company in Japan, who in turn sold the lathe to its subsidiary, Yamazen, USA, Inc. on September 27, 1980. Yamazen, USA, Inc. was a distributor of lathes and used the lathe as a demonstrator. It used the lathe as a demonstrator for several hundred, if not thousands of hours during three trade shows. After the last trade show in September 1981, the lathe was sold to the Hasbach Company, also a distributor, on January 7, 1982. Later, Hasbach returned the lathe to Yamazen who then sold the lathe to Aegis Engineering, Inc. It took delivery in early 1983 and used the lathe to manufacture various items until early 1990. Finally, the lathe came to rest in the hands of Kaufman who purchased it in 1990. While the lathe was being used by Kaufman it crashed and injured Shebel who died January 10, 1992.

If the lathe had been delivered to an initial user or consumer before January 10, 1982, then Shebel's cause of action is time barred. IC 33–1–1.5–5. There are two contentions urged.

First, the manufacturers contend that Yamazen, USA, Inc. became the initial user or consumer when Yamazen, USA, Inc. took delivery of the lathe on March 5, 1981 and used the lathe as a demonstrator model.

Secondly, Shebel's Estate contends that Aegis, as the first non-distributor, became the initial user or consumer in early 1983.

Any resolution of these contentions requires us to determine whether a corporation which generally engages in the business of distributing or re-selling a product can become an "initial user or consumer." Delivery of the product starts the statutory clock running only if the product is delivered into the hands of an "initial user or consumer." Can a manufacturer beat the statute of repose clock by running its product through a number of its distributors or middlemen? We conclude that it cannot.

■ Who is a "user or consumer" is a purely legal question. *Wingett v. Teledyne Industries, Inc.,* 479 N.E.2d 51, 54 (Ind. 1985); *Thiele v. Faygo Beverage, Inc.,* 489 N.E.2d 562, 585 (Ind.Ct.App.1986), *reh. denied, trans. denied.* Indiana Code Section 33–1–1.5–2 provides, in relevant part, that:

> 'User or consumer' means a purchaser, any individual who uses or consumes the product, or any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question, or any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.
>
> *     *     *     *     *     *
>
> 'Seller' means a person engaged in business as a manufacturer, a wholesaler, a retail dealer, a lessor, or a distributor.

IC 33–1–1.5–2.

■ The first contention above proposed that by operating the lathe as a demonstrator, Yamazen, USA, Inc. became an "individual who uses or consumes" the lathe. We disagree. A review of the Indiana Product Liability Act and applicable case law reveals a statutory scheme which does not contemplate an entity engaged in the business of a "seller" becoming a "user or consumer" even though the product may have been used during demonstrations.

In *Whittaker v. Federal Cartridge Corp.,* 466 N.E.2d 480 (Ind.Ct.App.1984), *reh. denied, trans. denied,* this court addressed whether the statute of repose began to run upon delivery of a product to a retailer or upon delivery to a retail customer. We held that the statute of repose did not begin to run until delivery to a retail customer even though the products in issue had been delivered to a retailer thirty-four and thirteen years before suit was filed. After analyzing the Act, we concluded "[i]t is clear from the statutory language and definitions that the term 'seller' ... and 'user and consumer' are mutually exclusive." *Id.* at 482. Any rule to

the contrary could result in the statute of repose running before the product ever reached a consumer. *Id.* at 484.

Shortly after *Whittaker,* the definition of "user or consumer" was again addressed by this Court in *Thiele v. Faygo Beverage, Inc.,* 489 N.E.2d 562 (Ind.Ct.App.1986). In *Thiele,* an employee at a distribution warehouse was injured as he was lifting a case of beverage. Glass from a broken bottle punctured his eye. The issue was whether an employee of a middle-man distributor could bring a strict liability action as a "user or consumer." This court concluded that he could not. "It appears the legislature intended 'user or consumer' to characterize those who might foreseeably be harmed by a product *at or after* the point of its retail sale or equivalent transaction with a member of the consuming public." *Id.* at 586 (emphasis in original). Accordingly, we concluded the term "user or consumer" did not include intermediaries in the distributive chain. *Id.* at 588.

*Whittaker* and *Thiele* make clear that simply delivering a product to a distributor for resale will not qualify that distributor or retailer as an "initial user or consumer." Although not involving instances where the distributors put the product to use in a demonstration, we conclude they also support the proposition that a distributor does not become an "initial user or consumer" by receiving delivery of the product for resale or by using the product in a demonstration.

We find further support for this holding through analysis of the purpose and policy supporting strict products liability. The Products Liability statute is a codification of the common law of products liability previously recognized in Indiana. *Reed v. Central Soya Co., Inc.,* 621 N.E.2d 1069, 1073 (Ind. 1993), *modified on other grounds,* 644 N.E.2d 84 (Ind.1994); *JKB v. Armour Pharmaceutical Co.,* 660 N.E.2d 602, 604 (Ind.Ct. App.1996), *reh. denied, trans. denied; Cornette v. Searjeant Metal Products, Inc.,* 147 Ind.App. 46, 258 N.E.2d 652, 656 (1970). Indiana case law expressly recognized the doctrine of strict liability as set forth in § 402A of the Restatement (Second) of Torts. *Reed, supra; Ayr–Way Stores, Inc.*

*v. Chitwood,* 261 Ind. 86, 300 N.E.2d 335, 339–40 (1973), *reh. dismissed; Whittaker, supra,* at 482. Accordingly, Indiana courts often look to the Restatement and comments thereto when interpreting the products liability act. *See, e.g., Lucas v. Dorsey Corp.,* 609 N.E.2d 1191 (Ind.Ct.App.1993), *trans. denied; Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045 (Ind.Ct.App.1990), *reh. denied; Montgomery Ward & Co. v. Gregg,* 554 N.E.2d 1145 (Ind.Ct.App.1990), *reh. denied.* We find the policy supporting products liability, as expressed in comment c of the Restatement, particularly instructive in this case.

> On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A cmt. c (1965). As recognized in *Whittaker,* "[t]his enunciation of the policy behind strict products liability reveals again the juxtaposition in products liability law between the using and consuming public on the one hand, and all those entities who have marketed the product, manufacturers and otherwise, on the other hand." *Whittaker, supra,* at 483.

Yamazen, USA, Inc. purchased the lathe to use as a demonstrator. The obvious purpose of demonstrating this lathe was to encourage potential buyers to purchase it and lathes similar to it. Thus, the "use" was for purposes consistent with and in furtherance of activities of a dealer or distributor interested

in lathe sales, not a user or consumer interested in using the lathe in a manufacturing or other similar setting. Too, in light of this fundamental policy underlying products liability law, we conclude that Yamazen, USA, Inc.'s status in this case is that of a seller, not a user or consumer. Yamazen, USA, Inc. earns its livelihood from the sale of products. This fact places Yamazen, USA, Inc. in the class of entities referred to as sellers or manufacturers. Therefore, not until the lathe was sold to Aegis in early 1983 did it reach the hands of an "initial user or consumer." Aegis was the first to purchase the lathe in a retail setting for use in manufacturing. Aegis does not earn its livelihood from the sales of lathes. Accordingly, since Aegis is the initial user and consumer of this lathe, the products liability action of the Shebel Estate is not barred by the statute of repose. As to the equities of such a holding, we agree with *Whittaker* that "[a]ny unfairness to defendants in requiring them to defend against unavoidably delayed actions is more than balanced by the intrinsic injustice of barring plaintiff's action before it can reasonably be brought." *Whittaker, supra,* at 484 (quoting *Romano v. Westinghouse Elec. Co.,* 114 R.I. 451, 461, 336 A.2d 555, 560 (1975)).

The Judgment of the trial court granting summary judgment because the "... action is barred by the applicable statute of repose" is reversed.

DARDEN, J., concurs in result with separate opinion.

GARRARD, J., dissents with separate opinion.

DARDEN, Judge, concurring in result.

Based upon the facts of this case, I concur in result. However, I am reluctant to declare that as a matter of law a product distributor can never be considered a user or consumer of that product.

GARRARD, Judge, dissenting.

I respectfully dissent. The materials before the court established that the lathe in question had been used by Yamazen commencing in 1981 as a demonstrator. At that

time it was used for hundreds, if not thousands, of hours running thousands of parts at trade shows. Furthermore, when the machine was sold it was sold as a used machine at a substantially discounted price.

I do not believe that "demonstration" is a shibboleth that precludes the operation of the ten year statute. On the undisputed facts of the case before us the trial court correctly granted summary judgment.

I would affirm.